CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
December 06, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

| | | |
|---|---|---|
| Josef Christian Schwaneberg, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 4:24-cv-00039 |
| Cyrilia Lopez, | ) | |
| | ) | |
| Respondent. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on a Petition for Return of Child to Habitual Residence. (Dkt. 1 [hereinafter "Pet."].)  The petition seeks to return a minor child, CFS,[1] to South Korea pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.*

Petitioner Josef Christian Schwaneberg ("Petitioner"), CFS's father, alleges that Respondent Cyrilia Lopez ("Respondent"), CFS's mother, wrongfully retained CFS in October 2022 after traveling to the United States.  (*See* Pet. at 3.)  Respondent opposes the petition.  She argues that Petitioner has failed to establish a *prima facie* case under the Hague Convention because CFS was not habitually resident in South Korea immediately before the alleged wrongful retention began.  She also claims two defenses under the Hague Convention,

---

[1] To protect the minor child's identity, he will be referred to solely by his initials.

arguing that Petitioner acquiesced or consented to CFS's retention and that CFS is "well-settled" in the United States.

As discussed below, Petitioner has established a *prima facie* case under the Hague Convention by a preponderance of the evidence, and Respondent has failed to demonstrate any defense by a preponderance of the evidence. For the reasons that follow, the court grants the petition for the return of CFS to South Korea.

## I.    Procedural History

On October 11, 2024, Petitioner filed the instant petition in the U.S. District Court for the Western District of Virginia. (*See* Pet. at 1.) On October 24, 2024, after service was completed, the court held a show cause hearing and scheduling conference for the parties. (Dkts. 12, 17.) Under the expedited timeline required for petitions filed pursuant to the Hague Convention,[2] the parties agreed to limited discovery and the court set this matter for a bench trial. (Dkts. 18, 24.)

Respondent filed an answer to the petition on November 6, 2024. (Dkt. 32.) Her answer raised several negative and affirmative defenses to the petition. The court held a final pretrial conference with the parties on November 14, 2024. (Dkt. 50.)

Both parties submitted motions for summary judgment. Petitioner moved for partial summary judgment, arguing that there is no genuine dispute of material facts necessary to prove his *prima facie* case under the Hague Convention. (*See* Pet'r's Mot. Summ. J. (Dkt. 59).) Meanwhile, Respondent moved for summary judgment, arguing that there is no genuine

---

[2] The Hague Convention requires signatory states to "use the most expeditious procedures available" to resolve disputes. Hague Convention, art. 2. The Convention also requires cases to normally be resolved within six weeks of the commencement of proceedings. *Id.* art. 11.

dispute of material facts necessary to prove that CFS's habitual residence is not South Korea, and therefore the Hague Convention does not apply and the petition should be dismissed. (*See* Resp't's Mot. Summ. J. (Dkt. 60).)  The court granted Petitioner's partial motion with respect to the date of the alleged wrongful retention, October 4, 2022, and denied the remainder of Petitioner's motion.  (Dkt. 65.)  The court denied Respondent's motion in full. (*Id.*)

The court conducted a bench trial on November 19, 2024.  At the conclusion of the bench trial, the court took the petition under advisement.  After reviewing the record as well as the evidence adduced at the bench trial, the court issues this memorandum opinion.

## II.    Findings of Fact

During the one-day bench trial, the court heard fact testimony from Petitioner, Respondent, Respondent's fiancé, and two of Respondent's neighbors in Red House, Virginia. The court notes that much of the testimony and evidence involves facts on which the parties agree or disputed facts that are immaterial to the decision, thus not requiring a determination. Other facts, however, are the subject of sharp disagreement, including those facts necessary to resolve the dispute.  As to those facts, the court makes certain findings specially.  Fed. R. Civ. P. 52(a).  In making its findings, the court has reviewed the record in its entirety, and it has had the opportunity to observe the witnesses, assess their credibility, and weigh their testimony.  As a general matter, given the evidence presented, the court finds neither party's testimony appreciably more or less credible than the other's.

## A.    The Parties

Petitioner was born in Germany and holds German citizenship.  (Draft Trial Transcript at 23 [hereinafter "Tr."].)  His parents, who are still living, reside in Germany.  (*Id.* at 23.) Petitioner has no siblings.  (*Id.*)  Petitioner is the Director of Product Creation and a Business Unit Director for Framas, a German company.  (Pet'r Ex. 42, Dep. of Josef Christian Schwaneberg 6:12–17, November 11, 2024 [hereinafter "Schwaneberg Dep."]; Tr. at 21.) Petitioner currently holds permanent resident status in South Korea.  (Tr. at 23.)

Respondent was born in Trinidad and Tobago and holds Trinidadian and Tobagonian citizenship.  (Pet'r Ex. 41, Dep. of Cyrilia Lopez 13:12, 69:6–9, November 5, 2024 [hereinafter "Lopez Dep."].)  She has no relationship with her mother, who lived in Trinidad and Tobago at the time of Respondent's last contact.  (Tr. at 155; Lopez Dep. at 13:17–14:4.)  Respondent believes her father, whom she never met, is deceased.   (Lopez Dep. at 14:16–20.) Respondent's only relative in the United States is one half-brother, with whom she does not have a close relationship.  (Tr. at 155; Lopez Dep. at 15:3–16:12.)  She does not have relationships with any other family members.  (Tr. at 155.)  Respondent is a self-employed singer-songwriter.  (*Id.* at 103.)  She is currently seeking asylum in the United States.  (*Id.* at 153.)

## B.    The Parties' Life in South Korea

Petitioner and Respondent met in South Korea in January 2015.  (*Id.* at 25.)  At the time, Respondent held a performing artist visa allowing her to work in the country.  (*Id.*) Petitioner and Respondent began dating in March 2016 and the two moved in together a month later to a large, leased three-bedroom apartment in Busan, South Korea.  (*Id.*)

At some point in 2016, Respondent's performing artist visa expired. (Lopez Dep. at 20:5–7.) Respondent did not apply for another performing artist visa after the expiration. (*Id.* at 22:13–15.) Instead, Respondent traveled in and out of the country as a tourist. (Tr. at 26.) Sometime in 2017, Petitioner proposed to Respondent, and the two were married in September 2017 in Germany. (*Id.*) The couple registered their marriage in Germany only. (Lopez Dep. at 19:23–20:1.) They continued to live together in Petitioner's large, leased apartment in Busan. (Tr. at 26.)

Shortly after their marriage, Petitioner and Respondent sought an F-2-3 visa (*i.e.*, a visa for spouses of permanent residents) for Respondent, which would have allowed her to work in the country. (*Id.* at 26–27.) Application for the visa requires the permission and consent of the permanent resident to sponsor the applying spouse. (Lopez Dep. at 21:10–16.)

Petitioner and Respondent applied for the F-2-3 visa in two places: first, in the immigration office in Busan, and second, in the South Korean Consulate in Frankfurt, Germany. (Tr. at 27; Schwaneberg Dep. at 20:10–13.) Neither application was successful. The application was denied in the Busan immigration office because the couple could not provide proof that their wedding paperwork was filed in Trinidad and Tobago. (Tr. at 27.) The application was denied in the Consulate in Frankfurt because Petitioner had not held his F-5 visa (*i.e.*, a visa for permanent residents) for a sufficient length of time. (*Id.* at 28.)

In his deposition, Petitioner admitted that it would have been possible to reapply for Respondent's F-2-3 visa in Frankfurt in 2019 or years thereafter. (Schwaneberg Dep. at 21:7–17.) Both parties acknowledged communication about the possibility of reapplying for an F-2-3 visa following the initial denials. (*Id.* at 23:13–17, 25:3–10; Lopez Dep. at 21:17–22:4.)

But after the two failed attempts in 2017, Petitioner did not help Respondent apply for the F-2-3 visa again.  (Schwaneberg Dep. at 21:18–22:1.)

Instead, Petitioner and Respondent applied for and secured for Respondent an F-1 visa (*i.e.*, a visa for visiting family members).  (Tr. at 26–27, 130.)  Under the F-1 visa, Respondent was not allowed to work in South Korea.  (*Id.* at 27.)  The couple renewed the F-1 visa for Respondent annually.  (*Id.* at 28.)

### C.    CFS's Birth and Early Years

CFS, Petitioner and Respondent's only child, was born in May 2018.  (*Id.* at 126.)  CFS is a German citizen.  (*Id.* at 24.)  He was born at a hospital in Busan, South Korea.  (*Id.*)  Due to complications during birth, CFS spent the first five to seven days of his life in a larger hospital in Busan.  (*Id.* at 56.)

The family lived together in Petitioner's large, leased three-bedroom apartment in Busan, the same apartment in which the couple lived since 2016.  (*Id.* at 26; Lopez Dep. at 24:7–10, 24:25.)  From birth, CFS slept in the same bedroom as his parents.  (Lopez Dep. at 25:2–5.)  First, he slept in their bed, then in a crib, then in a toddler bed still in the same bedroom.  (*Id.* at 25:8–10.)

Before CFS's birth, Petitioner and Respondent decided to hire a Nanny.  (*Id.* at 29:6–7.)  Neither had relatives who were living or had lived in South Korea, and they had no one else who could help with CFS.  (*Id.* at 29:14–18.)  Respondent found and hired the Nanny through an ex-pat group on Facebook, (*id.* at 29:8–11), and the Nanny began work approximately three weeks after CFS was born, (*id.* at 27:23–28:2).

Other than Petitioner, Respondent, and the Nanny, no one else took care of CFS during his first years in South Korea. (Tr. at 30–31.) During the day, Respondent breast-fed CFS and helped the Nanny clean up. (Lopez Dep. at 30:7–9.) She would also run errands outside the home for groceries, household supplies, and clothing. (*Id.* at 30:10–13.) Though Respondent could not work outside the home, she would sometimes attend performances or gatherings with other musician friends. (*Id.* at 30:14–22.)

Following CFS's birth, Petitioner was able to remain home for a few days. (*Id.* at 32:3–4.) After that, Petitioner's usual routine was to depart for work between 8:00 and 9:00 a.m. and to return from work between 7:00 and 8:00 p.m. (*Id.* at 32:4–8.) Petitioner traveled on work trips and would occasionally stay late for work dinners. (*Id.* at 32:9–12.) Respondent and CFS accompanied Petitioner to some of these dinners. (*Id.* at 32:12–13.)

### D.    Discussions of Leaving South Korea

As early as 2019, Petitioner and Respondent began considering a move to Vietnam for Petitioner's work. (Tr. at 66, 74.) The plan at the time was for Respondent and CFS to live in Vietnam permanently, and for Petitioner to travel back and forth to and from South Korea when required. (Schwaneberg Dep. at 18:7–17.)

That year, Petitioner and Respondent traveled to Vietnam to tour a German school in Ho Chi Minh City. (Tr. at 30; Schwaneberg Dep. at 16:10–17.) Given CFS's age at the time— around one year old—enrollment in the school was years away. (Tr. at 30.) Still, Petitioner and Respondent checked out the school to learn about its possible offerings. (*Id.*) Petitioner testified at trial that this was the only step taken to move the family to Vietnam. (*Id.*)

However, in his deposition, Petitioner testified that Respondent had signed a rental agreement on an apartment in Vietnam with Petitioner's authorization in October 2019. (Schwaneberg Dep. at 15:19–16:20.)  Additionally, Respondent contended that she discharged the family's Nanny in 2020 because of the planned move to Vietnam, as well as the continued risk of contracting COVID-19 from outside the home.  (Tr. at 82; Lopez Dep. at 30:24–31:3.) Petitioner, by contrast, suggests that Respondent felt the Nanny's help was unnecessary.  (Tr. at 31.)  Either way, the family's plan to move to Vietnam was interrupted by the COVID-19 pandemic.  (*Id.* at 76.)

### E.    Life in South Korea

From May 2018 until April 2022, the family lived together in the same large, leased apartment in Busan.  Petitioner also owned a studio apartment in the same complex.  (*Id.* at 22, 25.)  All property, including the cars and apartments, was in Petitioner's name.  (*Id.* at 81.)

CFS was enrolled in the South Korean health insurance system and received routine care from pediatricians located at the main hospital.  (*Id.* at 31; Lopez Dep. at 25:23–25.)  CFS also saw physicians in South Korea for any urgent or immediate care.  (Tr. at 32.)  But CFS did not have a regular pediatrician who treated him when he went to the hospital.  (*Id.* at 57.) Though CFS visited pediatricians during his time in South Korea, concerns about the risks of contracting COVID-19 at the hospital prevented the family from taking in CFS to get all of his regularly scheduled vaccinations.  (Lopez Dep. at 27:3–8.)  CFS also did not see a dentist in South Korea.  (*Id.* at 27:16–17.)

At home, CFS spoke English with Respondent and German with Petitioner. (Schwaneberg Dep. at 13:6–9.)  Leading up to the time Respondent and CFS left South Korea,

CFS continued to share the bed with his parents or sleep in his toddler bed in the same bedroom. (Tr. at 55; Lopez Dep. at 25:11–17.) After discharging the family's Nanny in 2020, Respondent did not attempt to find a replacement caregiver for CFS. (Lopez Dep. at 31:19–21.) Other than Respondent and Petitioner, no one else cared for CFS during this time. (Tr. at 30–31.)

Petitioner and Respondent took CFS out on various excursions in South Korea as a family, ranging from errands to vacations. On the weekends, Petitioner and Respondent would take CFS shopping at the mall and eat lunch together. (*Id.* at 32.) Although CFS was still quite young to play with larger kids, Petitioner and Respondent took him to different playgrounds and parks. (*Id.*) They also brought him to private beaches around Busan. (*Id.* at 80.) The family took trips together, driving up the coast of South Korea and visiting places within a couple hours of Busan. (*Id.* at 33.) Respondent testified that these trips were usually structured around Petitioner's schedule and hobbies. (*Id.* at 80.)

Aside from exploring their natural surroundings, the family engaged with Korean culture to some extent given that they were a non-Korean family living in Korea. For example, the family often ate out. (*Id.* at 82–83.) When they did, they sometimes frequented Korean restaurants but, more often, they ate at restaurants serving non-Korean cuisines. (*Id.* at 82–83; Lopez Dep. at 33:24–34:3, 34:23–35:2.) At home, Respondent usually made Caribbean or German food or foods appropriate for CFS's palate at the time. (Lopez Dep. at 35:8–15.) For CFS's first birthday, Respondent took him to a Korean photo studio and dressed him in a traditional hanbok. (Tr. at 83.) But Respondent did not report other cultural experiences in which the family engaged.

CFS did not participate in or belong to any institutions or groups in South Korea, (*id.* at 79), nor did he attend any form of organized religious services, (*id.* at 57). As CFS grew, he became interested in playing with toy cars and planes. (Schwaneberg Dep. at 13:13–18.) In 2021, CFS occasionally played with two children of one of Petitioner's work colleagues but does not appear to have had any regular playmates. (Tr. at 33.) One of the two children with whom CFS occasionally played was two years older than CFS and the other child was two months younger than CFS. (*Id.*) The children played at the beach together in Busan roughly twice a month during the summer of 2021. (*Id.* at 33–34; Schwaneberg Dep. at 14:12–17.) CFS did not see the two playmates again in 2022. (Schwaneberg Dep. at 14:8–9.) In addition, Respondent brought CFS to three sessions of "play time kindergarten," where CFS could play with local children. (Tr. at 81–82.)

CFS sometimes traveled with Petitioner and Respondent outside of the country. (*Id.* at 29.) Before leaving South Korea in April 2022, CFS had visited Germany, Vietnam, and the United States. (*Id.*) Each trip lasted approximately two to three weeks. (*Id.*) Though most of the visits were associated with Petitioner's work, the couple took CFS to Germany in 2019 to visit Petitioner's parents, CFS's grandparents, to celebrate Christmas. (*Id.*; Schwaneberg Dep. at 26:5–13.)

## F.    Respondent's Contracts with Swagg Media

In December 2021, Respondent became in contact with Craig Nobles, a music producer in Los Angeles. (Lopez Dep. at 38:16–39:1.) Around that time, Petitioner became aware of two potential contracts that Respondent was considering signing with Nobles. (Schwaneberg Dep. at 27:2–6.) The first was an agreement concerning rights to Respondent's

music, and the second was an agreement providing for various allowances and compensation to Respondent to work in Los Angeles. (*Id.*)

Over email, video chat, and phone conversations through the course of a week, Respondent negotiated the first contract with Swagg Media, the company Nobles owned. (Lopez Dep. at 39:2–6.) That contract provided that Respondent and Swagg Media would combine their resources to find Respondent recording deals. (*Id.* at 39:10–23.) Respondent contends that at that time, she had not officially decided to come to the United States. (*Id.* at 38:11–19.) Petitioner saw this contract in December 2021. (Schwaneberg Dep. at 30:15–17.)

Respondent executed the second agreement with Swagg Media the following month. (*Id.* at 28:1–12.) The contract stipulated that Swagg Media would provide Respondent with a living allowance and separate housing in Los Angeles. (Tr. at 100; Lopez Dep. at 46:7–8.) Petitioner read this contract sometime in January or February 2022. (Schwaneberg Dep. at 30:18–21.)

G.     **Discussions of Divorce**

Petitioner and Respondent began discussing divorce in January 2022, following the negotiation of Respondent's first contract with Swagg Media. (Tr. at 34, 131.) At that time, Petitioner consulted with lawyers in South Korea about divorce proceedings. (*Id.* at 34, 59.) Respondent also placed a down payment to hire a lawyer to begin divorce proceedings. (*Id.* at 98.) She informed Petitioner that she had paid an initial fee to pursue a divorce in South Korea but did not tell him divorce papers had been or would be filed. (*Id.* at 100.)

At that time, Respondent's credit card stopped working. The parties dispute the cause of the credit card freeze, (*id.* at 59, 98), but the ultimate result was that Respondent requested

and received a refund of her initial payment to the divorce attorney to cover her regular living expenses, (*id.* at 98). She also sold her recording equipment and pawned her wedding ring for the same purpose. (*Id.*) Respondent did not inform Petitioner that she was no longer using the divorce lawyer (*id.* at 100) and Petitioner concedes he never heard a divorce case would be filed in South Korea (*id.* at 59–60).

Initially, Respondent believed that she and Petitioner would be able to divorce amicably. (*Id.* at 131.) Petitioner first wanted joint custody of CFS, although he noted that visitation agreements were "not relevant" because Respondent would no longer reside in South Korea (Resp't Ex. 3), and Petitioner planned to move to Vietnam following the end of the lease on the family's large three-bedroom apartment in Busan (Resp't Ex. 6). Respondent similarly recognized that joint custody would be "near impossible" with the parents living in different countries. (Resp't Ex. 4.) Eventually, both parents sought sole custody. (Tr. at 35, 131.) After this point, discussions of any divorce proceedings stopped. (*Id.* at 35, 131.)

### H. Discussions Related to Respondent's Travel

The same month, Petitioner and Respondent began discussing the possibility of Respondent traveling to the United States with CFS to pursue her music career. (*Id.* at 36, 132.) From their initial discussion, Respondent conveyed to Petitioner that she intended to be in the United States for approximately three months to work with Nobles. (*Id.* at 36, 38; Schwaneberg Dep. at 28:16–19.) With Petitioner, Respondent referred to this travel as a "business trip." (Tr. at 37, 132; Pet'r Ex. 20.) In an email to her divorce attorney, however, Respondent indicated that she would be "moving to the USA." (Resp't Ex. 2.)

Petitioner initially objected to CFS leaving the country with Respondent. (Tr. at 132.) In mid-January, Respondent sent Petitioner a travel authorization form, which she produced after a conversation with a friend of Petitioner's, Chris Brandt, and a Google search. (*Id.* at 99; *see also id.* at 63.) Respondent asked Petitioner to sign the form for CFS over email. (*Id.* at 133.) The authorization was for travel to the United States from January 30, 2022, to March 15, 2022. (*Id.* at 38; Pet'r Ex. 22.) At that time, Petitioner had not yet agreed to CFS's travel to the United States. (Tr. at 38, 133–34.) Petitioner did not sign the authorization form for the January 30 travel dates. (*Id.* at 38, 63–64.)

Following this exchange, Brandt began to informally mediate an agreement between Petitioner and Respondent concerning whether CFS would travel with Respondent to the United States. (*Id.* at 64.) In mid-March, Respondent and Brandt had a phone call during which Brandt asked if Respondent would consider Petitioner coming with her and CFS to the United States. (*Id.* at 99; *see also id.* at 64.) Respondent answered yes. (*Id.* at 99.)

Following Brandt's mediation of the situation, Petitioner agreed to allow CFS to travel with Respondent to the United States for a period of three months. (*Id.*) Petitioner sent Respondent a detailed email outlining his expectations for the trip. (*Id.*; Resp't Ex. 12.) According to the email, Petitioner, Respondent, and CFS were to depart South Korea together on April 5, 2022. (Resp't Ex. 12; Tr. at 64.) Petitioner was to return to South Korea on April 11, 2022. (Resp't Ex. 12; Tr. at 43.) Petitioner wrote that he authorized CFS to remain with Respondent until June 20, 2022. (Resp't Ex. 12.) But Petitioner explicitly noted that he did not authorize CFS to travel outside Los Angeles without prior notice. (*Id.*) He also stated that he expected daily updates on CFS's whereabouts by email, text, or phone call. (*Id.*) Finally,

- 13 -

Petitioner stated that Respondent and CFS would be provided return tickets for June 2022. (Resp't Ex. 12; Tr. at 49; Lopez Dep. at 41:22–42:5.)

Respondent had already purchased one-way tickets to the United States for herself and CFS at some point in March.  (Lopez Dep. at 41:8–15.)  Upon receipt of Petitioner's email, Respondent sent an acknowledgement but did not explicitly agree to any of its terms.  (Tr. at 100, 134; Pet'r Ex. 23.)  She did, however, change the dates on her and CFS's plane tickets so they would depart South Korea on April 5, 2022, as Petitioner's email directed.  (Resp't Ex. 12; Lopez Dep. at 41:8–12.)

## I.    Respondent's Visa Status

While negotiations of the United States trip were ongoing, Respondent continued to reside in South Korea on an F-1 visa for visiting family members.  (Tr. at 28, 130; Lopez Dep. at 20:18–20.)  The visa had to be renewed annually.  (Schwaneberg Dep. at 22:2–3.)  The renewal could only take place in person and required the presence of both Petitioner and Respondent.  (Tr. at 68.)  Because renewing the F-1 visa was relatively straightforward, applicants could call to make an appointment within a couple of days.  (*Id.* at 28.)

Respondent's most recent F-1 visa was set to expire in April 2022.  (*Id.* at 130.) Respondent had an appointment to renew that visa the same month.  (*Id.* at 29.)  But Petitioner did not reschedule the appointment after learning that Respondent would be in the United States at that time.  (*Id.* at 68.)

Instead, in early April, Petitioner and Craig Nobles corresponded about Respondent's visa status in the United States.  (*Id.* at 50; Schwaneberg Dep. at 49:20–50:6, 52:11–53:3.)  To travel to the United States, Respondent obtained a B-1/B-2 visa.  (Lopez Dep. at 61:16–18.)

- 14 -

CFS held the same visa. (Tr. at 60.) The visa allowed Respondent to remain in the United States for three to six months as a tourist or conducting business negotiations. (Lopez Dep. at 61:19–62:8.) Before the visa's expiration, the holder could apply for an extension of the visa. (*Id.* at 62:9–11.)

On April 2, 2022, Nobles wrote to Petitioner expressing his desire for Respondent to obtain a more permanent immigration status in the United States. (Schwaneberg Dep. at 49:20–50:3.) Petitioner responded by asking Nobles for his plan to help Respondent change her visa status. (*Id.* at 50:4–7.) Specifically, Petitioner wanted Nobles to help Respondent obtain a visa allowing her to work as a singer. (Tr. at 60; Schwaneberg Dep. at 50:15–51:1.) Petitioner was aware that Respondent and CFS had already obtained B-1/B-2 visas that would expire October 4, 2022. (Tr. at 60.)

## J.      The Family Travels to the United States

On April 5, 2022, the family traveled together to the United States. (*Id.* at 64.) Respondent packed three or four suitcases for the trip, which contained clothes for three seasons, toys for CFS, Respondent's studio equipment, and any documents Respondent might need. (*Id.* at 135.) Respondent left behind some of her clothes, clothes of CFS, and some of CFS's toys in South Korea. (*Id.* at 135–36.) Petitioner testified that the family packed as they would for any normal trip. (*Id.* at 40–41.) And Respondent testified that it was not her intention when she arrived in the United States in April 2022 to stay there indefinitely. (*Id.* at 135.)

For the first week following their arrival, Respondent and CFS stayed in a serviced apartment in Los Angeles. (*Id.* at 43, 136.) Petitioner stayed elsewhere. (Lopez Dep. at 75:1–

7.)  Upon Respondent's arrival in the United States, Nobles continued to negotiate potential recording deals and traveled with Respondent to look for apartments and houses where she and CFS could stay.  (Tr. at 101.)  But Nobles did not make any offers on any of the homes.  (*Id.* at 105.)

Instead, following Petitioner's return to South Korea, Respondent and CFS moved to Nobles' mother's home in Los Angeles, where Nobles also lived.  (*Id.* at 43, 136.)  Respondent testified that when she traveled to the United States, she was not planning on living with Nobles.  (*Id.* at 100.)  Instead, she believed that Swagg Media would provide her and CFS separate housing, as had been outlined in their second contractual agreement.  (*Id.*)  Nobles did not follow through on that obligation at any time, and Respondent and CFS continued to live with Nobles in his mother's home.  (*Id.* at 43, 100, 136.)

### K.    CFS's Life in California and Return Tickets to South Korea

From April to November 2022, Respondent and CFS lived in the Los Angeles home with Nobles and his mother.  (*Id.* at 43, 136–37.)  Respondent and Nobles continued to pursue business negotiations to further Respondent's singing career.  (*Id.* at 47, 109.)  By her account, Respondent met with at least ten producers.  (*Id.* at 109–10.)  Nobles continued negotiations with music executives and introduced Respondent to potential investors.  (*Id.* at 101.)

CFS's life in Los Angeles had some loose structure.  CFS did not have a regular pediatrician in California and instead visited urgent care facilities when he was ill or injured.  (*Id.* at 151.)  Nor did he see a dentist.  (*Id.*)  However, CFS did regularly attend day-care beginning in May 2022, which Petitioner approved of and supported financially.  (*Id.* at 47–48, 84.)  During this time, Respondent and Nobles sometimes sent Petitioner pictures of CFS.

(*Id.* at 67.)  CFS's day-care also sent pictures and provided Petitioner updates on CFS when requested.  (*Id.* at 52, 67.)

As Respondent and CFS's original return date in June 2022 drew close, Petitioner wanted his son to return to South Korea.  (*Id.* at 42.)  Respondent does not, however, recall agreeing to return on that date.  (Lopez Dep. at 42:17–21.)  In fact, Petitioner rebooked Respondent and CFS's plane tickets to South Korea for October 4, 2022, the date their visas in the United States would expire.  (Tr. at 42; Schwaneberg Dep. at 45:7–46:11.)

### L.    Petitioner Visits California

In August 2022, Petitioner visited Respondent and CFS in Los Angeles.  (Tr. at 43, Schwaneberg Dep. at 47:8–12.)  Petitioner was able to spend one afternoon with CFS at Nobles' residence.  (Schwaneberg Dep. at 49:1–5.)

Although Petitioner stressed that he wanted CFS to come home at that time, he admitted that he did not express that to Respondent during his visit.  (*Id.* at 48:4–8.)  He also acknowledged feeling less concerned about the situation at the time, as he knew Respondent's address and received updates on CFS from his day-care in Los Angeles.  (Tr. at 52.)

During the visit, the couple had a very short conversation alone in Nobles' residence.  (Schwaneberg Dep. at 49:6–7.)  The two remember the conversation very differently.  Despite recalling that Respondent asked him what he wanted to have happen, Petitioner could not recall any other details of the conversation.  (*Id.* at 49:8–19.)  Petitioner acknowledged that the couple did not have any discussions concerning their divorce.  (Tr. at 49.)  Respondent reported the couple did not talk about the situation with CFS during the visit.  (*Id.* at 125.)  Nor were there attempts to have such a conversation.  (*Id.*)  Respondent recalled asking

Petitioner if he had anything to say regarding the whole situation.  (*Id.* at 125–26.)  Petitioner reportedly responded, "What can I say?" and shrugged.  (*Id.* at 125.)  Petitioner then departed the United States.  (*Id.*)

This was the last time that Petitioner saw CFS in person.  (*Id.* at 46.)

### M.    CFS Does Not Return

Respondent and CFS continued to hold tickets for a return flight to South Korea on October 4, 2022, the date their tourist visas in the United States were set to expire.  (*Id.* at 42.)  As October approached, Petitioner asked repeatedly about Respondent's plans regarding her and CFS's visa status.  (Schwaneberg Dep. at 67:9–68:6.)  Petitioner admits Respondent communicated with him via email about her application to extend Respondent and CFS's tourist visas in the United States beyond the October 4, 2022 expiration date.  (*Id.* at 67:19–68:13.)  However, Petitioner contends he did not understand what application was filed.  (*Id.* at 68:11–13.)  Respondent later learned her application for extension was denied, though not before she filed an affirmative asylum application for herself and CFS.  (Lopez Dep. at 62:24–63:13.)

CFS did not return to South Korea on October 4, 2022.  Though Petitioner claims that he expected their return and believed Respondent and CFS would be on that flight, Petitioner admitted that he never went to the airport that day.  (Tr. at 68–69.)   And while Petitioner testified that he believed CFS would be returning home on October 4, 2022, he never told anyone of that fact.  (*Id.* at 68.)  Petitioner also never offered to bring CFS back to South Korea himself.  (*Id.* at 69.)

At the time, Respondent's F-1 visa in South Korea had expired, but she could still enter the country as a tourist. (*Id.* at 67–69.) Throughout 2022, CFS remained a permanent resident of South Korea. (*Id.* at 42.) Petitioner stressed repeatedly at trial that Respondent was always able to return CFS to South Korea herself because she could have entered the country as a tourist. (*Id.* at 69.) Indeed, according to Petitioner, Respondent has previously done just that. (*Id.*) Back when the couple was first married, before any attempts at other visas were made, Respondent remained in the country as a tourist after her performing artist visa expired. (*Id.*) However, Petitioner never discussed this possibility with Respondent. (*Id.* at 69–70.)

Petitioner also claims that he was not aware of Respondent and CFS's asylum applications in the United States. (*Id.* at 66.) Petitioner testified that he only became aware of the asylum applications that Respondent and CFS filed after initiating the instant Hague Convention petition. (*Id.*) During his deposition, however, Petitioner recalled a discussion with Chris Brandt about Respondent's application for asylum taking place in January 2023. (Schwaneberg Dep. at 56:8–16.) Petitioner was, however, aware that Respondent had filed for extensions of her and CFS's tourist visas in the United States. (Resp't Ex. 47.) After Petitioner inquired about their visa statuses on November 13, 2022, Respondent informed him that the pair were "in the process of this application for extension" of their visas and had recently been fingerprinted. (*Id.*)

### N.    Respondent and CFS Leave California

Shortly thereafter, Respondent and CFS moved out of Nobles' mother's house. Respondent alleges that Nobles physically assaulted her on one occasion towards the end of November 2022. (Tr. at 105.) Respondent and CFS moved out of Nobles' mother's home

that night. (*Id.*) The two stayed with an acquaintance for one night, after which they stayed in motels. (*Id.* at 106.) Respondent then rented an Airbnb, where she and CFS lived from December 2022 until May 2023. (*Id.*) When Respondent asked Petitioner for assistance paying for the Airbnb and for a rental car, Petitioner declined through email. (*Id.* at 48; Schwaneberg Dep. at 54:18–55:5.) However, Petitioner did suggest to Respondent that she relocate to Vietnam, where the two could share custody of CFS. (Resp't Ex. 21.) In January 2023, Petitioner contributed $1,000 to a GoFundMe set up to support Respondent and CFS "[u]ntil [Respondent's] immigration status has been obtained." (Resp't Ex. 22; Schwaneberg Dep. at 53:14–17.)

During this time, Respondent filed a restraining order against Nobles. (Tr. at 101.) She alleges he cyberstalked and harassed her online following the filing. (*Id.* at 101–02, 104.) Respondent contends Nobles communicated with Petitioner over email throughout this period. (*Id.* at 102.) She also believes Nobles knew where she was living in California after she left his mother's home. (*Id.* at 106.)

Around this time, Respondent learned of a vacant apartment in Red House, Virginia, through one of her TikTok followers, Mark Stubbs. (*Id.* at 106–07.) Stubbs did not live in the apartment and offered it to Respondent and CFS. (*Id.*) Respondent agreed to move to the apartment, a studio in a refurbished barn known locally as a "barndominium," in May 2023. (*Id.*)

Respondent and CFS traveled to Virginia by road trip in May 2023. (*Id.* at 107–08.) The pair first stopped in San Francisco to pick up the keys to the barndominium from Stubbs. (*Id.* at 142.) They then visited the Grand Canyon, Cadillac Ranch in Amarillo, Texas, and a

historic railroad track in Tennessee as they traveled east.  (*Id.* at 108.)  They stayed in motels and hotels at night.  (*Id.* at 108, 137.)  Respondent recalls the trip took between five and ten days.  (*Id.* at 137.)  The two arrived in Virginia later that month.  (*Id.* at 137–38.)

### O.    CFS's Life in Virginia

1.    Housing

Upon their arrival in May 2023, Respondent and CFS began living in Mark Stubbs' barndominium, located in Red House, Virginia.  (*Id.* at 137–38.)  Respondent then informed Petitioner that she and CFS had moved to Virginia and that he did not have to continue paying childcare bills.  (*Id.* at 44–45; Schwaneberg Dep. at 54:13–17.)  She did not, however, provide him with their updated address.  (Tr. at 45.)

Respondent's restraining order against Nobles was denied shortly after her arrival in Virginia.  (*Id.* at 102.)  At some point, Respondent became romantically involved with Stubbs and continued to live in the barndominium until November 2023.  (*Id.* at 107.)  Respondent did not pay rent for the apartment while she and CFS lived there.  (Lopez Dep. at 89:21–22.)  In November 2023, when Stubbs and Respondent ended their relationship, Stubbs asked that she move out of the barndominium.  (Tr. at 142.)  Respondent and CFS then moved to a rented three-bedroom house approximately one half-mile away, located on the same road as the barndominium, where she and CFS live today.  (*Id.* at 107, 125, 138.)  Respondent normally pays her rent each month.  (*Id.* at 114.)  However, she admitted that there has been at least one instance where her fiancé, Danny Crawford, assisted with paying rent.  (*Id.*)

2.    Education, Activities, and Medical Care

In July 2023, Respondent enrolled CFS in kindergarten at the local public elementary school. (Resp't Exs. 34, 35; Lopez Dep. at 90:1–5.) He began school in August as a kindergartener and now is a first grader there. (Tr. at 86.) CFS was adequately immunized in accordance with the minimum requirement for attending school in Virginia. (Resp't Ex. 39 at 2–3.) While CFS did well academically, he had behavior issues and struggled socially when he first arrived in Virginia. (*Id.* at 19–20, 27–28.) However, although a committee at CFS's elementary school had recommended a full speech and language evaluation for CFS in October 2023, by the spring of 2024, CFS no longer demonstrated any limitations on his educational performance. (*Id.* at 14–17.) By all accounts, CFS is now a good student who has adjusted well academically. (*Id.* at 38; Resp't Ex. 40.)

CFS does not participate in any extracurricular activities in Red House. (Tr. at 150.) Respondent testified that CFS is simply not interested in anything other than cars. (*Id.*) Respondent described CFS's after-school activities as road-tripping with her to eat out, visiting car shows, or attending community events. (*Id.* at 119.) She also described attending an after-school Christmas carol campfire and performing for the Veteran's Day county event, which CFS attended. (*Id.* at 119–20.) Respondent wants to enroll CFS in a NASCAR program for children, given CFS's interest in cars, but he is not currently old enough to participate. (*Id.* at 117–18.)

Respondent testified that CFS's closest friends are two children, who are siblings, that live just one house away. (*Id.* at 115.) The two children, although both older than CFS and above him in grade level, attend the same school as CFS. (*Id.*) Respondent testified that she

and CFS would stop by their house for events like Thanksgiving, pool parties and barbeques, or simply to drop off cakes or flowers. (*Id.* at 120–21.) The children have not, however, played with CFS at his own home, (*id.* at 171), and none of CFS's classmates have come to his house for a playdate, (*id.* at 150). Aside from the two children, CFS has not gone to another child's house for a playdate. (*Id.*) CFS regularly sees a pediatrician in Red House. (*Id.* at 110, 151.) During one visit, the pediatrician noted that frequent moving was a "stressor" for CFS. (Pet's Ex. 31.) CFS also saw a dentist in Virginia after the instant Hague Petition was filed. (Tr. at 151.)

　　　　3.　　Finances

After arriving in Virginia, Respondent continued working as a singer-songwriter. (*Id.* at 103.) Her audience consists mainly of those who follow her live streams on TikTok. (*Id.*) Respondent makes her living through subscriptions and gifts via TikTok. (*Id.* at 103–04.) She also receives tips and other gifts through CashApp, PayPal, or Venmo. (*Id.*) Roughly fifteen to twenty percent of the gifts Respondent receives online come from people she knows. (*Id.* at 113.) Respondent testified that she earned roughly $75,000 during 2023. (*Id.*; Resp't Ex. 49.) And from August 2023 until November 2024, Respondent testified that she has earned roughly $100,000. (Tr. at 113; Resp't Ex. 51.)

　　　　4.　　Contact with Petitioner

After Respondent and CFS moved to Virginia, Petitioner was able to speak with CFS through FaceTime calls, generally on Sundays. (Tr. at 70.) To initiate the calls, Petitioner would usually text Respondent first, who would then call on FaceTime. (*Id.*) Respondent allowed the calls to take place approximately fifty percent of the time. (*Id.*) When the calls

did take place, Respondent did not do anything to interfere or disrupt the FaceTime interactions between Petitioner and CFS.  (*Id.*)  During these calls, Petitioner could sometimes see Respondent and CFS's home in Red House but did not ask CFS about places he'd visited, what school he went to, or any medical visits.  (*Id.* at 72–73.)

In July 2023, Petitioner again asked to visit CFS in person in September.  (Resp't Ex. 34; Tr. at 46; Lopez Dep. at 144:8–13.)  Respondent answered that Petitioner's proposed day would not work for CFS's schedule and suggested that FaceTime would be sufficient.  (Resp't Ex. 34; Tr. at 46; Lopez Dep. at 143:6–8.)  When Petitioner followed up again requesting an in-person visit, Respondent did not reply.  (Tr. at 46.)  Respondent has never shared CFS's addresses in Virginia with Petitioner, citing fears that she could not trust him because he was frequently copied on emails from Nobles.  (*Id.* at 121.)  Respondent testified that she lost trust in Petitioner after he became aware of Nobles' harassing behavior but continued to deny her requests for financial assistance.  (*Id.* at 122.)

### P.    CFS's Visits to Texas

Since his arrival in Virginia in May 2023, CFS has also spent time outside the state. Respondent met her fiancé, Danny Crawford, online in November 2023.  (*Id.* at 145–46, 188.) The next month, she and CFS traveled to Amarillo, Texas—Crawford's home—to spend the Christmas holidays with him.  (*Id.* at 146, 180–81.)  That was the first time Respondent and CFS met Crawford in person.  (*Id.* at 146, 188.)  In either December 2023 or January 2024, Respondent and Crawford became engaged to be married.  (*Id.*)  Respondent admits that sometime around February 2024, she was considering a move to Amarillo.  (*Id.* at 148–49.)

An email from that time shows Respondent expressing interest in CFS's enrollment in first grade at an Amarillo school.  (*Id.*; Pet'r Ex. 39.)

Most significantly, CFS spent approximately two and a half months in Amarillo, Texas, from June to August 2024.  (Tr. at 141, 180–81.)  Respondent and CFS lived with Crawford there until CFS was due to begin first grade.  (*Id.* at 141, 193.)  During the visit, Respondent expressed her happiness with their living situation in Amarillo.  (*Id.* at 146–47; Pet'r Ex. 38 at 14.)  And by the end of the summer, CFS reported that he did not want to leave.  (Tr. at 193.)

Respondent reports that Crawford has been a good influence on CFS.  (*Id.* at 119.)  She notes that Crawford has provided clothes and gifts for CFS for his birthday, Christmas, and other special occasions.  (*Id.*)  Crawford has also provided Respondent with monetary gifts to pay off debt and, on one occasion, to pay Respondent's rent.  (*Id.* at 114, 188–90.)

Although Respondent and Crawford both admitted considering the possibility of Respondent and CFS moving to Amarillo, both insist there are no concrete plans to do so.  (*Id.* at 91–92, 190–91.)  In particular, Crawford cites the need to purchase a larger home as an obstacle to the move.  (*Id.* at 191.)

## Q.    **Virginia Divorce Proceeding**

In January 2024, Respondent consulted with a New York lawyer specializing in family law concerning the best way to obtain an "international divorce."  (*Id.* at 124, 154.)  Four months later, Respondent hired a lawyer from Lynchburg, Virginia, to assist with her divorce.  (*Id.*)  In August 2024, Respondent filed for divorce in Virginia.  (*Id.* at 45, 123.)  Although Respondent requested her lawyer keep her address from Petitioner, it was necessary to disclose

as part of the court filing. (*Id.* at 123.) Thus, Respondent's address appears on the complaint for divorce. (*Id.*)

Following finalization of the divorce, Respondent and Crawford would like to get married. (*Id.* at 91.) However, both Respondent and Crawford were hesitant about whether they would move in with one another after their marriage. (*Id.* at 91–92.) Respondent testified that she could not move in "any time soon" with Crawford because of the legal expenses of the instant petition. (*Id.*) Specifically, because of these proceedings, Respondent testified that she is no longer able to move comfortably to Texas to be with Crawford. (*Id.* at 92.)

### R. Petitioner's Life in Vietnam / South Korea

In August 2022, Petitioner stopped leasing the large three-bedroom family apartment in Busan. (*Id.* at 34.) Instead, he moved into his studio apartment in the same building. (*Id.*) Petitioner testified that he still considers his "home base" to be South Korea. (*Id.* at 74.) However, he testified that he spends "a lot of time" in Vietnam depending on his job. (*Id.*) Petitioner's passport shows that in the period after Respondent and CFS left for the United States, Petitioner split time nearly evenly between Vietnam and South Korea. (*Id.* at 65.) That split, alternating spending roughly two weeks in Vietnam and two weeks in South Korea, was consistent with the plan that the couple had back in 2019. (*Id.* at 66.) In his deposition, Petitioner claimed that he spent roughly seventy percent of his time in South Korea and thirty percent of his time in Vietnam. (Schwaneberg Dep. at 8:18–9:5.)

Petitioner continues to work for his company in South Korea. (Tr. at 55.) Petitioner currently receives two salaries, one in Korean won for his work in South Korea and one in U.S. dollars for his work in Vietnam. (Schwaneberg Dep. at 7:6–8:3.) Petitioner continues to

pay taxes on the studio apartment he owns in South Korea.  (Tr. at 74.)  During 2022, Petitioner testified that he did not discuss plans to move to Vietnam with Respondent.  (*Id.* at 75–76.)  He also testified that any prior joint plan to move to Vietnam had dissolved by 2022. (*Id.* at 74.)

## III.    Conclusions of Law

### A.    Legal Framework

The Hague Convention seeks to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Hague Convention, pmbl.  The Hague Convention applies to children under the age of 16 who habitually resided in a state that is a party to the Convention immediately prior to the child's wrongful removal or retention.  *Id.* art. 4.  "[T]he retention of a child is to be considered wrongful where . . . it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention."  *Id.* art. 3.  "Wrongful retention refers to the act of keeping the child without the consent of the person who was actually exercising custody."  *Brandt v. Caracciolo*, No. 22-2320, 2023 WL 7015680, at *2 (4th Cir. Oct. 25, 2023), *cert. denied*, 144 S. Ct. 1458 (2024) (quoting 51 Fed. Reg. 10494-01, 10503).

The United States and South Korea are both signatories of the Hague Convention. *Status Table, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction*, HCCH, https://perma.cc/4S4L-5UHK (last visited Dec. 4, 2024); *U.S. Hague Convention Treaty*

*Partners*, U.S. Dep't of State, Bureau of Consular Affs., https://perma.cc/S29V-KNK4 (last visited Dec. 4, 2024).

The United States implemented the Hague Convention through ICARA. *See* 22 U.S.C. §§ 9001, *et seq.* Under ICARA, courts in the United States may "determine only rights under the Convention and not the merits of any underlying child custody claims." *Id.* § 9001(b)(4). Accordingly, courts have a limited role in reviewing petitions under the Convention and according to ICARA. Courts must determine "whether there has been a wrongful [retention], the existence and exercise of custody rights at the time of the [retention], and the applicability of any Hague Convention defenses." *Wertz v. Wertz*, No. 7:18-cv-00061, 2018 WL 1575830, at *1 (W.D. Va. Mar. 30, 2018).

To establish a petitioner's *prima facie* case under the Hague Convention, the petitioner must establish by a preponderance of the evidence that: (1) the child was "habitually resident" in the petitioner's country of residence at the time of retention; (2) the retention was in breach of the petitioner's custody rights under the law of his home state; and (3) the petitioner had been exercising those rights at the time of retention.[3] *Brandt*, 2023 WL 7015680, at *2; *see also Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009); *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007).

Even if a petitioner establishes a *prima facie* case for return of a child, "[t]he return remedy is not absolute." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014). There are a limited

---

[3] "The burden of showing something by a preponderance of the evidence . . . simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Salem v. Holder*, 647 F.3d 111, 116 (4th Cir. 2011) (internal quotation marks omitted).

number of "narrow exceptions" which, if proven by a respondent, excuse a court from returning a child. *Alcala v. Hernandez*, 826 F.3d 161, 169 (4th Cir. 2016). The parties have litigated the possible applicability of two such exceptions.

Finally, the court reiterates that its inquiry is *not* what is in the best interest of CFS; rather, the court can only determine if the petitioner has made a *prima facie* case and whether any defenses apply. *See* 22 U.S.C. § 9001(b)(4); *Alcala*, 826 F.3d at 171; *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 610–11 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002). Whether the court orders the return of CFS does not alter any preexisting allocation of custody rights between Petitioner and Respondent because the Hague Convention leaves ultimate custodial decisions to the courts of the country of habitual residence. *Wertz*, 2018 WL 1575830, at *7 (citing *Abbott v. Abbott*, 560 U.S. 1, 9 (2010)).

## B.   *Prima Facie* Case

### 1.   Habitual Residence

Under the first prong of the *prima facie* case, Petitioner must show by a preponderance of the evidence that CFS was "habitually resident" in South Korea at the time of the alleged wrongful retention, October 4, 2022.[4] The Convention's text does not define the term "habitual residence." *Monasky v. Taglieri*, 589 U.S. 68, 76 (2020). At a high level of generality, "[a] child 'resides' where she lives." *Id.* "[R]esidence in a particular country can be deemed

---

[4] At the beginning of the bench trial, the court granted partial summary judgment to Petitioner on the narrow issue of the date of the alleged wrongful retention. (*See* Tr. at 4; Dkt. 65.) That date—October 4, 2022—is not disputed by the parties, as both Petitioner and Respondent agree as to when any alleged wrongful retention began. (*See* Resp'r's Mot. Summ. J. at 1; Pet'r's Mot. Summ. J. at 5; Resp'r's Trial Br. at 12 (Dkt 45) (noting that "[i]f there was ever a non-consensual retention, it was probably at [October 4, 2022]"); Pet'r's Trial Br. at 7 (Dkt. 40) ("[T]he date this Court must concern itself with, the date of wrongful retention, is October 4, 2022.").)

'habitual' . . . only when [the child's] residence there is more than transitory." *Id.* The term "habitual" suggests "a fact-sensitive inquiry, not a categorical one." *Id.* at 77.

A child's habitual residence means "the family and social environment in which [the child's] life has developed." *Id.* So, "[w]hat makes a child's residence 'habitual'" is "some degree of integration by the child in a social and family environment." *Id.* (internal quotation marks omitted).

The "appropriate standard" for determining habitual residence is the "totality-of-the-circumstances standard," where "[n]o single fact . . . is dispositive." *Id.* at 78, 84. Given the "fact-driven inquiry, courts must be 'sensitive to the unique circumstances of the case and informed by common sense.'" *Id.* at 78 (quoting *Redmond v. Redmond*, 724 F.3d 729, 744 (7th Cir. 2013)). For older children, courts should look at "facts indicating acclimatization." *Id.* Those facts could include:

- a change in geography combined with the passage of an appreciable period of time;
- age of the child;
- immigration status of child and parent;
- academic activities;
- social engagements;
- participation in sports programs and excursions;
- meaningful connections with the people and places in the child's new country;
- language proficiency; and
- location of personal belongings.

*Id.* at 78 n.3 (quoting J. Garbolino, Fed. Jud. Ctr., *The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges* 67–68 (2d ed. 2015)) (cleaned up).

For younger children, like infants, "the intentions and circumstances of caregiving parents are relevant considerations." *Id.* at 78. But, again, "[n]o single fact . . . is dispositive

across all cases." *Id.* "Federal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country; the storage and shipment of family possessions; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." *Maxwell*, 588 F.3d at 252. *Monasky* specifically cautions against an approach that renders an actual agreement (in the form of shared intent as to where habitual residence lies) between the parents dispositive, which "would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected." *Monasky*, 589 U.S. at 81 (quoting *Taglieri v. Monasky*, 907 F.3d 404, 410 (6th Cir. 2018)). But courts continue to weigh the last shared intent of the parents in the totality-of-the-circumstances analysis. *See Dumitrascu on behalf of A.M.B.D. v. Dumitrascu*, 2022 WL 1529624, at *3 (10th Cir. May 16, 2022) (noting that because parents "never had a shared, mutual intent to live apart" and the expiration of the mother's green card meant "the family could no longer live together in the United States," Romania must be the child's habitual residence).

For all children regardless of age, the court's inquiry must be "informed by common sense." *Monasky*, 589 U.S. at 78 (cleaned up). "Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.*

Petitioner has shown, by a preponderance of the evidence, that the totality of circumstances establishes that CFS's habitual residence at the time of the alleged wrongful

retention—October 4, 2022—was South Korea. The court's analysis is driven by several factors and is sensitive to the unique nature of this case.

First, the court heard testimony confirming that CFS only ever lived in South Korea from his birth in 2018 until his departure to the United States in 2022. Indeed, the parties stipulated to this fact before trial. (Joint Stipulations of Fact at 2 (Dkt. 44) ("CFS was born in, and continuously resided in South Korea until April 5, 2022.").)

Second, the court heard testimony concerning CFS's connections with South Korea from the standpoint of his medical care. Following his birth in a South Korean hospital, CFS was enrolled the country's health insurance system and received routine pediatric care as well as emergency care from a local hospital. However, the court notes there is some evidence against acclimatization in South Korea. For one, CFS did not have one regular pediatrician who treated him when he went to the hospital. For another, Respondent's concerns about the risks of contracting COVID-19 at the hospital prevented the family from taking CFS in to get all of his regularly scheduled vaccinations. On top of that, CFS never visited a dentist in South Korea.

Third, the court heard testimony and received evidence concerning CFS's various social engagements and participation in excursions in South Korea. Both Petitioner and Respondent described taking CFS out on various excursions, ranging from errands to vacations. From playgrounds to parks, malls to beaches, cafes to stores, CFS's interactions with his surroundings in South Korea demonstrate "some degree of integration by the child in a social and family environment." *Monasky*, 589 U.S. at 77. While Respondent stated that she felt Petitioner's description of various excursions was "exaggerated," she also testified to a variety

- 32 -

of places CFS would go in South Korea.  (*See* Tr. 80.)  CFS's age at the time of these events also contributes to the appropriateness of this degree of activity.

Fourth, the court heard testimony concerning CFS's personal belongings still in South Korea.  When Petitioner and Respondent left for the United States in April 2022, they took a similar quantity of belongings to other foreign trips they had taken.  *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 294 (3d Cir. 2006) (finding some evidence of abandonment of prior habitual residence when the minor child "brought more personal belongings with her than usual, in anticipation that she would remain [elsewhere] after the summer").  This meant that while some of CFS's toys and clothes were taken to the United States, the remainder of his personal belongings remained in South Korea.

These factors as a whole support a finding that immediately before October 4, 2022—the date of the alleged wrongful retention—CFS's habitual residence was South Korea.  This finding likewise comports with common sense, which suggests that South Korea, the place where CFS was born, received medical care, formed some degree of social and family integration, and lived with his family indefinitely prior to the alleged wrongful retention, "is likely to be [his] habitual residence."  *Monasky*, 589 U.S. at 78.

Respondent contests this prong, primarily arguing that South Korea was not CFS's habitual residence, and instead, that CFS had no habitual residence at all.  (*See* Resp't's Trial Br. at 10 (comparing the instant petition with other cases in which children were found not to have a habitual residence); Resp't's Mot. Summ. J. at 8–9 (arguing that Petitioner and

Respondent's life became so transient in 2022 as to abandon South Korea as CFS's habitual residence).)[5]

Respondent first contends the family's residence in South Korea became transitory in 2019, when the family began making plans to leave the country and move to Vietnam. (Resp't's Mot. Summ. J. at 8–9.)  Respondent points to the couple's 2019 tour of a German school in Vietnam that Petitioner hoped CFS would attend as evidence of this plan.  (*Id.* at 8.) Respondent also signed a one-year lease of an apartment in Vietnam in October 2019.  And with the onset of the COVID-19 pandemic, Respondent discharged the family's Nanny, citing health risks alongside the eventual move to Vietnam.  By all accounts, no additional steps were taken to move the family to Vietnam during or after the COVID-19 pandemic.  Nevertheless, Respondent argues that these steps demonstrate a shared intent and plan to abandon South Korea as the family's habitual residence that persevered despite the COVID-19 pandemic, which Respondent claims "scrambled, among other things, people's normal expectations and behaviors concerning the relationship between one's location, length of stay, interactions, geographical ties, and intended long-term purpose, so that some rules of thumb used in the past to determine habitual residence are now less accurate."  (*Id.* at 9.)

The court is not persuaded by this argument.  First, the court heard testimony that the COVID-19 pandemic frustrated the couple's 2019 plan to eventually move to Vietnam. Second, even if the pandemic had not thwarted the couple's plan, the actions and steps taken in advance of a move to Vietnam would still be just one factor among many that the court

---

[5] The court notes that, to successfully raise this negative defense, Respondent need only prove that CFS's habitual residence was not South Korea.  That is, Respondent need not prove any other country *was* CFS's habitual residence at that time.

considers.  The few first steps taken towards the move in 2019 and 2020 were not followed by any concrete action signaling continued intent in the following years, especially in October 2022.  Despite the parties' actions in 2019, the intentions, circumstances, and behavior of Petitioner, Respondent, and CFS indicate that in October 2022, South Korea was CFS's habitual residence.

In the alternative, Respondent argues that, even if the family's plan to move to Vietnam did not survive the COVID-19 pandemic, statements by Petitioner in January 2022 were sufficient "to instantly put the family, for all relevant practical purposes, on the pier waiting for a ship to come and take them somewhere else, leaving Korea behind permanently."  (*Id.*)  Specifically, Respondent points to Petitioner's statement in divorce discussions that he would move to Vietnam, and that Respondent would not be able to stay in South Korea, as evidence of the family's plan to abandon South Korea permanently.  (*Id.*)  According to Respondent, CFS's residence in South Korea became transitory at that moment and remained so throughout 2022.  (*Id.*)

The court finds this argument equally unpersuasive.  Petitioner's January 2022 statements demonstrate only *Petitioner's* intent to move the family outside South Korea. Petitioner testified that he did not discuss plans to move to Vietnam with Respondent and his statement in January 2022 explicitly refers to himself only.  (*See* Resp't Ex. 6 ("The plan for me is to move to Vietnam when the contract for the apartment expires mid August.").)  Even if Petitioner's statements represented a shared intent, the post-*Monasky* analysis again considers shared intent one among many factors courts must consider in making the habitual residence determination.  Balanced against the totality of the circumstances in this case, even such a

- 35 -

shared intent to eventually move to Vietnam does not overcome the evidence that, immediately before the alleged wrongful retention, CFS was "at home" in South Korea.

The court notes that Respondent also points to "both parents' follow-through" as proof that the parties shared an intent—whether formed in 2019 or 2022—for CFS to abandon South Korea as his habitual residence. (Resp't's Mot. Summ. J. at 9.) Respondent has not returned to South Korea since October 4, 2022, and Petitioner has spent significant time in Vietnam since the same date. These later actions, Respondent argues, offer proof that a shared plan of abandonment was executed in 2022. (*Id.*)

These arguments are also unavailing. The Fourth Circuit has explained that "[o]n its face, habitual residence pertains to customary residence *prior* to the removal. The court must look back in time, not forward." *Id.* (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993)) (emphasis added). Thus, the court will not look to the parties' later actions to determine CFS's habitual residence at the time of retention. The Court's inquiry is cabined by time, and, as a result, whether the parents subsequently moved permanently outside of South Korea does not concern the CFS's habitual residence at the time of retention.

The court therefore finds that Petitioner has established that CFS was habitually resident in South Korea—where CFS was born, grew up, and spent most of his entire life with his family— immediately prior to the alleged wrongful retention by a preponderance of the evidence.

### 2.    Breach of Petitioner's Custody Rights

Under the second prong of the *prima facie* case, Petitioner must show by a preponderance of the evidence that Respondent's retention of CFS in the United States

beyond October 4, 2022, breached Petitioner's custody rights under South Korean law and the Hague Convention. Article 5 of the Convention explains that "rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5.

Under South Korean law, parental rights, including the right of custody over a child "should be executed jointly by the parents." (Affidavit of South Korean Law ¶ 5 (Dkt. 38 at 3–6 [hereinafter "Affidavit"]); Statutes of the Republic of Korea, Civil Act, art. 909(1)–(2) (Dkt. 38 at 7 [hereinafter "Civil Act"]) ("Parents shall have the parental authority of their minor child. . . . The parental authority shall be jointly exercised by both parents during their marriage.").) The Affidavit submits that parental rights shared jointly "shall not be executed exclusively by one parent unless the other parent . . . gives up it or the court determines to take parental right[s] away from one parent." (Affidavit ¶ 10 (citing Civil Act, art. 909).)

Respondent's retention of CFS was in breach of Petitioner's custody rights under South Korean law. The Affidavit suggests that it would be a violation of Article 909 to allow a single parent to unilaterally establish the child's place of residence when custody rights are shared. That is because both parents share the right—according to Article 909—to "determine the child's place of residence." Hague Convention, art. 5. By keeping CFS in the United States past the agreed-upon return date, Respondent was unable to provide care for the child or determine where the child would reside. That fact alone demonstrates the retention of CFS constituted a breach of "rights of custody" under the Hague Convention as defined by South Korean law. Therefore, the court finds that Petitioner has established that the wrongful

retention by Respondent was in breach of his custody rights under South Korean law by a preponderance of the evidence.

### 3.    Exercising Custody Rights

Under the third prong of the *prima facie* case, Petitioner must show by a preponderance of the evidence that he had custody rights and exercised such rights under South Korean law. There is no dispute in this case as to whether Petitioner had custody rights, as defined under South Korean law, and was at all relevant times exercising those custody rights.   (Joint Stipulations of Fact at 2 ("1. Petitioner has rights of custody at all times, and as defined under South Korea law.  2. At all times relevant, Petitioner was actually exercising those rights of custody.").)   Therefore, the court finds that Petitioner has established that he was exercising his custody rights at the time of the retention by a preponderance of the evidence.

### C.    Hague Convention Exceptions

### 1.    Consent or Acquiescence

Respondent alleges the affirmative defenses of acquiescence and consent.  (Answer at 8–9 (Dkt. 32).)[6]  Article 13 of the Hague Convention provides that a court "is not bound to order the return of the child" if the petitioning parent "consented to or subsequently acquiesced in the removal or retention" of the child.  Hague Convention, art. 13(a).  To successfully raise these affirmative defenses, Respondent must prove by a preponderance of the evidence that Petitioner's subjective intent was to consent or acquiesce to CFS's retention

---

[6] The court notes that both parties conflated consent and acquiescence throughout this proceeding.  The court will exercise its discretion to assume the parties were referring to the most appropriate defense where this occurred.

in the United States.  22 U.S.C. § 9003(e)(2)(B); *see Padilla v. Troxell*, 850 F.3d 168, 175–76 (4th Cir. 2017).

Though consent and acquiescence are often raised together, the court treats them as "separate and 'analytically distinct' affirmative defenses."  *Padilla*, 850 F.3d at 175 (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)).  Consent concerns the petitioning parent's conduct before or at the time of the child's retention, while acquiescence involves conduct occurring after the retention.  *See id.*; *Baxter*, 423 F.3d at 371.  For the reasons set forth below, the court finds Respondent has not established either defense by a preponderance of the evidence.

### a)    Consent

"To establish consent, we focus on the parties' conduct *prior* to the removal or retention."  *Padilla*, 850 F.3d at 176.  Respondent may prove Petitioner's consent by offering Petitioner's formal or informal statements, conduct, or writings.  *Id.*; *see Baxter*, 423 F.3d at 371 ("Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a).  Often, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute.").  The court must "evaluate what the petitioner contemplated and agreed to, as well as the nature and scope of consent, including any conditions or limitations" to determine whether, at the time of removal, petitioner fully and unconditionally consented to the contested action.  *Padilla*, 850 F.3d at 176.

The court finds that Respondent has failed to prove by a preponderance of the evidence that Petitioner consented to CFS's indefinite retention in the United States prior to

the family's departure from South Korea in April 2022. First, Petitioner's email explicitly limited his consent to CFS's travel to a period of three months. Second, although Petitioner asked Nobles to help Respondent obtain a more permanent visa status in the United States, that communication did not explicitly or implicitly request plans for extension of CFS's visa as well. *See Padilla*, 850 F.3d at 176–77 (affirming district court's finding of consent where the petitioner "willingly accompanied" the respondent to obtain the child's passport and agreed to surrender custody to the respondent).

Petitioner's travel with Respondent and CFS to the United States in April 2022 similarly does not constitute consent for retention beyond October 4, 2022. At the time, neither Petitioner nor Respondent believed the stay would become indefinite. Petitioner's desire to ensure Respondent and CFS were adequately housed and settled does not equate to unconditional consent for an indefinite period. Nor does his knowledge of Respondent and CFS's address and contact information render his conditional consent unconditional: "The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Baxter*, 423 F.3d at 371. Petitioner's extension of Respondent and CFS's return plane tickets to October 2022 similarly does not constitute indefinite consent beyond that time.

The court also does not find Respondent has proven by a preponderance of the evidence that Petitioner consented to CFS's retention in the United States during his August 2022 visit to California. Respondent acknowledges that there was no discussion of issues regarding CFS during that visit. Nor were there any attempts at discussion. At most,

- 40 -

Respondent contends that at the conclusion of the visit, she asked Petitioner if he had anything to say about the family's living situation. She reports that Petitioner responded only "what can I say?" and shrugged. (Tr. at 125.)

The court finds Petitioner's ambiguous language does not rise to the level of affirmative consent. *See, e.g.*, *Onobun v. Ojiekhudu*, 2024 WL 4679401, at *6 (D. Md. Nov. 5, 2024) (finding Petitioner's statement of "Fine. You can have [the child]. You can have [the child]. You can take [the child] to America. You can do what you want to do" spoken in a moment of frustration to be "far different from consenting to the child's removal"); *but see Padilla*, 850 F.3d at 177 (finding Petitioner's repeated statements that the child was better off with Respondent in the United States to be evidence of consent).

Additionally, "a petitioner's conduct *after* removal can further inform whether she consented at the time of removal." *Padilla*, 850 F.3d at 176. The court finds that Respondent has failed to prove by a preponderance of the evidence that Petitioner's conduct after October 4, 2022 constituted consent. Petitioner's failure to arrive at the airport on the date CFS was due to return home, as well as his failure to inform others of CFS's arrival, suggests that Petitioner may not have truly believed Respondent and CFS would return to South Korea on that date. But it does not prove by a preponderance of the evidence that Petitioner consented to the retention. Petitioner repeatedly expressed his understanding that CFS would remain in the United States for only the duration of his tourist visa. Petitioner's actions, writings, and conduct leading up to the date of wrongful retention support that "subjective intent." *Id.* at 176.

- 41 -

Respondent's failure to inform Petitioner that she and CFS would not be returning on the October 4 flight also weighs against a finding of consent. *See Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996) [hereinafter *Friedrich II*] ("In fact, [Petitioner's] testimony is strongly supported by the circumstances of the removal of [the child]—most notably the fact that [Respondent] did not inform [Petitioner] that she was departing. The deliberately secretive nature of her actions is extremely strong evidence that [Petitioner] would not have consented to the removal of [the child]." (internal citations omitted)). The court finds Respondent has failed to demonstrate the affirmative consent defense by a preponderance of the evidence.

### b)    Acquiescence

In contrast with consent, "the defense of acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" *Baxter*, 423 F.3d at 371 (quoting *Friedrich II*, 78 F.3d at 1070)). When seeking a possible waiver of custody rights, "[e]ach of the words and actions of a parent during the separation are not to be scrutinized." *Friedrich II*, 78 F.3d at 1070. "Subsequent acquiescence requires more than an isolated statement to a third-party." *Id.* Instead, courts should look to a petitioner's words or actions as a whole for "clear and unambiguous conduct." J. Garbolino, Fed. Jud. Ctr., *The 1980 Hague Convention on the Civil Aspects of International Child Abduction: A Guide for Judges* 128 (3d ed. 2023)).

The court finds that Respondent has failed to prove by a preponderance of the evidence that Petitioner acquiesced to CFS's indefinite retention in the United States after October 4, 2022. Petitioner has made no formal statement renouncing his rights or agreeing

to CFS's retention in the United States since October 2022. Nor has Respondent proved that Petitioner's actions amount to a "consistent attitude of acquiescence over a significant period of time." Although Petitioner paid for CFS's day-care expenses, Respondent concedes, and the court agrees, that financial support does not establish acquiescence (Resp't's Trial Br. at 13) and acknowledges that Petitioner's payment of CFS's day-care and his contribution to the GoFundMe in early 2023 do not amount to the acquiescence defense. (*Id.*)

Respondent argues that Petitioner's failure to swiftly pursue a Hague Convention case or "seek the child's return in any other way" for two and a half years amounts to a "consistent attitude of acquiescence over a significant period of time." (*Id.*) Respondent appears to rely on Petitioner's continued communication with CFS without demanding his return to South Korea as evidence of this acquiescence. But a petitioning parent's efforts to remain involved in his child's life do not usually amount to acquiescence. For example, in *Leonard v. Lentz*, respondent argued that the petitioner had acquiesced to their children's removal to the United States when he indicated he "understood the move to America was intended to be permanent" and "sought updates on his children's lives and well-being without simultaneously demanding their return to Turkey." 297 F. Supp. 3d 874, 891–92 (N.D. Iowa 2017). The district court ultimately found that these communications were not sufficient to establish acquiescence. *Id.* at 892 ("[A]n irreconcilable marriage coupled with requests for updates on the couple's children does not equate [to] acquiescence to the children's removal to another country, as respondent would have this Court hold."). In fact, Petitioner testified that he feared that Respondent would cut off his communication with CFS if he demanded CFS's return.

Respondent also points to Petitioner's consistent concern for Respondent's immigration status in the United States as evidence of acquiescence. (Resp't's Trial Br. at 13.) For instance, Respondent argues that Petitioner should have known Respondent was seeking asylum in the United States when he contributed to her GoFundMe in early 2023. By contributing, Petitioner "actually encouraged the mother and child to stay in the U.S. for longer, and more permanently." (*Id.*)

The court is of the opinion, however, that such encouragement lies firmly in the realm of support for the absent child and is therefore inappropriate for the acquiescence analysis. That a parent may provide funds, gifts, clothing, or care for their absent child without acquiescing to their retention in a foreign country stems from the basic premise that a parent's concern for their child's health and wellbeing should not be fatal to their Hauge Convention case. That same concern is present here in Petitioner's desire for CFS to avoid the confusion and stress of sudden deportation, even from the country to which CFS was removed. The court therefore finds Petitioner's actions in support of Respondent's permanent visa status in the United States do not amount to the affirmative defense of acquiescence.

It is true that Petitioner, unlike some other petitioning parents, has not "resolutely sought custody of his son" since the time of his wrongful retention. *See Friedrich II*, 78 F.3d at 1070. Petitioner's claims that this was motivated by his fear of Respondent cutting off communication between him and CFS, as well as his lack of knowledge of her Virginia address, appear to the court to adequately explain Petitioner's behavior. The court accordingly finds Respondent has failed to demonstrate the affirmative acquiescence defense by a preponderance of the evidence.

- 44 -

2.    <u>Well-Settled</u>

Respondent also alleges the affirmative defense that CFS has become well-settled in the United States.  (Answer at 9–10.)  If a petition under the Hague Convention has not been filed within one year of the child being wrongfully removed or retained, a court shall nevertheless order return "unless it is demonstrated that the child is now settled in its new environment."  Hague Convention, art 12.  In other words, "the Convention does not require a court to order a child returned if the action under the Convention was not commenced within one year of the abduction and the child is now settled in her or his new environment." *Alcala*, 826 F.3d at 169; *see also Luis Alfonso V.H. v. Banessa Cristina A.Z.*, 512 F. Supp. 3d 633, 644 (W.D. Va. 2021) ("The well-settled defense may be asserted only when an 'action [is] not commenced within one year of the abduction.'" (quoting *Miller v. Miller*, 240 F.3d 392, 402 n.14 (4th Cir. 2001)).  Respondent bears the burden of establishing that the child is settled by a preponderance of the evidence.  *See* 22 U.S.C. § 9003(e)(2)(B).  Petitioner's action was not commenced within one year of the wrongful retention on October 4, 2022.

The Hague Convention does not define what it means for a child to be "settled." However, the Fourth Circuit has held that "for a child to be settled within the meaning of the Convention, the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment."  *Alcala*, 826 F.3d at 170.

Because of the Convention's strong presumption of return, "[t]he United States Department of State has declared that 'nothing less than *substantial* evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof' under the well-settled defense."  *Luis Alfonso V.H.*, 512 F. Supp. 3d at 645

(quoting 51 Fed. Reg. 10494, 10509 (Mar. 26, 1986)) (emphasis added).  So in general, "the passage of time alone or minimal evidence of ties to the new environment are insufficient to prove a child is 'settled' under the Convention."  *Habrzyk v. Habrzyk*, 775 F. Supp. 2d 1054, 1066 (N.D. Ill. 2011).

In analyzing significant connections, the court "should consider any relevant circumstance that demonstrates security, stability, or permanence—or the lack thereof—in a child's new environment."  *Alcala*, 826 F.3d at 170.  Although "there is no formulaic way to tabulate or weigh any particular factor or circumstance," a non-exhaustive list of factors include:

- the age of the child;
- the stability of the child's residence in the new environment;
- whether the child attends school or day care consistently;
- whether the child attends church [or participates in other community or extracurricular school activities] regularly;
- the respondent's employment and financial stability;
- whether the child has friends and relatives in the new area; and
- the immigration status of the child and the respondent.

*Id.* at 171 (quoting *Lozano v. Alvarez*, 697 F.3d 41, 57 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014)) (cleaned up).  The court will consider these as well as other relevant factors under the totality of the circumstances in determining whether CFS is well-settled in his new environment, the United States.  *See id.* at 170.

First, CFS's age weighs against finding that CFS is well-settled.  A reality of the well-settled analysis is that "the younger the child is, the less likely it is that he or she is old enough to allow meaningful connections to the new environment to evolve."  *Habrzyk*, 775 F. Supp. 2d at 1067 (internal quotation marks omitted); *see also Luis Alfonso V.H.*, 512 F. Supp. 3d at

647 ("At ten years old . . . [the child's] connections to her surroundings are more enduring and meaningful than a younger child's might be."). CFS was four years old when the wrongful retention began in the United States. Today he is just six years old. Because of his young age, it has sometimes been difficult for CFS to create meaningful connections with his new environment. Even Respondent admits that CFS's age has presented some obstacles. (*See* Tr. 117–18 (Respondent noting that while there is a NASCAR youth racing program she would like to get CFS involved in, "he's . . . too young for that").)

Second, the lack of stability of CFS's residence in the United States weighs against finding that CFS is well-settled. CFS's first six months following the wrongful retention on October 4, 2022, were markedly unstable. After fleeing Nobles' house in Los Angeles, Respondent and CFS stayed in motels and then an Airbnb. Eventually, after receiving an offer for housing from someone she met online, Respondent moved CFS across the country, embarking on a wide-ranging road trip. During that time, CFS's life was unpredictable, and it did not allow him to forge meaningful connections with his surroundings. Accordingly, CFS had no real connection with family (other than Respondent), friends, or his community from the time of his wrongful retention until his move to Red House, Virginia.

Respondent and CFS's instability of residence since moving to Red House similarly weighs against a finding that CFS is well-settled. The court notes that Respondent and CFS originally stayed in a "barndominium" offered to them at no charge by Stubbs, who Respondent met online and with whom she began a romantic relationship. Respondent and CFS stayed there approximately six months, between May and November 2023. After that, Respondent and CFS had to move roughly a half mile down the same road to a rented three-

bedroom house because Respondent and Stubbs broke up and he asked that she move out of the barndominium.  Additionally, instead of living in this new residence continuously, Respondent and CFS spent nearly three months in Amarillo, Texas, visiting Respondent's fiancé, Danny Crawford.  The court heard testimony that Respondent has considered moving to Texas to be with Crawford and that Respondent has looked into schools in Texas for CFS as part of that consideration.  However, both Respondent and Crawford appeared uncertain as to when or even if they would move in together after they are married.

Third, CFS's school enrollment and participation weighs in favor of a finding that he is well-settled in the United States.  CFS began kindergarten in the fall of 2023 and entered first grade in the fall of 2024.  Respondent testified that his behavior has markedly improved over the last year and that he gets along with his classmates well.  By all accounts, CFS is a good student who is doing well in first grade.

Fourth, CFS's lack of involvement in things like church, extracurriculars, or community-based organizations weighs against a finding that he is well-settled in the United States.  CFS has no such connections in Red House and does not appear interested in sports or other community activities.  However, the court is mindful that a six-year-old child would not have had extensive opportunities to participate in church, extracurriculars, or community-based organization activities.  *Cf. Luis Alfonso V.H.*, 512 F. Supp. 3d at 647 (finding a child's future desire to participate in a sport a factor weighing in favor of a well-settled finding).

Fifth, Respondent's employment and financial stability weighs neither in favor nor against a finding that he is well-settled in his new environment.  It is clear that Respondent has made money performing on live streams via TikTok.  Additionally, the court heard no

testimony that CFS's basic needs are not currently being met.  The court notes, however, that Respondent's income is not always predictable and is inherently volatile based on the nature of her work.  And the court heard testimony that money has been an issue as Respondent contemplates her and CFS's next move, including whether to move in with Crawford following their marriage.  Assessing all of the testimony under the totality of the circumstances, the court finds this factor minimally relevant as it weighs neither in favor nor against a well-settled finding.

Sixth, CFS's lack of friends and relatives weighs against a finding that he is well-settled in his new environment.  Apart from Respondent, CFS has no relatives in the area.  Other courts have considered the presence of nearby family as a strong indication that a child is well-settled, due to the support system those relatives may provide.  *See, e.g.*, *Rodriguez v. Noriega*, No. 23-cv-3911, 2024 WL 1988236, at *8 (D. Minn. May 6, 2024); *Luis Alfonso V.H.*, 512 F. Supp. 3d at 646 (finding that the child's "family network appears to be broad and strong in Virginia" weighs in favor of well-settled).

Additionally, given that CFS's core family consists of just the parties, it is notable that Respondent has not allowed Petitioner to visit CFS in person, and that Petitioner has not been able to see CFS in person since August 2022.  *See Luis Alfonso V.H.*, 512 F. Supp. 3d at 647.  While Respondent has allowed Petitioner to speak with CFS over FaceTime on many occasions, Respondent declined to allow Petitioner to visit CFS in Virginia and did not provide Petitioner with an address of any of the locations they moved to.  *Philantrope v. Jean*, No. 21-81398-CIV, 2021 WL 4896266, at *8 (S.D. Fla. Oct. 19, 2021) (finding that a respondent had not established that the child was well-settled in part because of a pattern of failing to disclose

- 49 -

the movements and whereabouts of the minor child to petitioner); *cf. Carmona v. Moreno*, No. 1:23CV967, 2024 WL 579239, at *5 (M.D.N.C. Feb. 13, 2024) (finding that a respondent's refusal to allow contact can interfere with the parental relationship such that a child is not well-settled). It is also unclear, based on the record, how frequently Petitioner and CFS were actually able to connect via FaceTime. Petitioner's unrebutted testimony is that his success rate in connecting with CFS was roughly fifty percent. Petitioner's occasional inability to connect with CFS via FaceTime likewise weighs against a finding that he is well-settled in his new environment. *Luis Alfonso V.H.,* 512 F. Supp. 3d at 647 (noting that a petitioner's "difficulty on occasion in contacting the minor child" is a fact that weighs against a finding of well-settled).

CFS's lack of friendships in his new environment significantly weighs against a well-settled finding. Although the court heard testimony that CFS has formed some friendships while residing in Red House, Virginia, the record lacks information about the depth and quality of those relationships. While the court heard testimony that CFS has become friends with two children who live nearby, it is unclear how regularly or consistently the children played together. And other than stopping by the house of those two children, CFS has not gone to any other child's house for a playdate nor has CFS hosted any friends at his house.

Seventh, CFS and Respondent's current immigration status weighs neither for nor against a finding that CFS is well-settled in his new environment. Even though their original visas in the United States have expired, Respondent and CFS are in the middle of utilizing the proper procedures to achieve lawful status in the United States through the asylum process.

Until there is a determination of their asylum claims, there is little "practical impact on the security, stability, and permanence of [CFS's] life." *Alcala*, 826 F.3d at 174.

Because the factors listed above are "non-exhaustive," the court also considers other aspects of CFS's life in the United States in making the holistic determination of whether CFS has "significant connections demonstrating a secure, stable, and permanent life." *Id.* at 171. CFS's medical care appears to be a source of stability and weighs in favor of a finding that CFS is well-settled. CFS has seen the same pediatrician since arriving in Red House, Virginia. And CFS has also gone to the dentist, but only after the petition was filed. CFS's behavioral improvements in the last year also weigh in favor of a finding that CFS has become well-settled as the court heard testimony and received evidence of CFS's significant strides in self-control, maturity, and manners both at school and at home.

At bottom, the court finds that Respondent has not shown by a preponderance of the evidence that CFS is well-settled. Though evidence of CFS's school participation, medical care, and behavioral improvements favors finding that CFS is well-settled, this evidence is outweighed by the absence of meaningful community connections, the lack of any family in the community, and CFS's young age. The evidence relevant to the Respondent's employment and financial stability and CFS and Respondent's immigration status does not support a conclusion one way or another as to the well-settled defense's applicability.

In fact, "[t]here is no question that [Respondent] is a loving parent who attends to [CFS's] material and educational needs." *Vite-Cruz v. Sanchez*, 360 F. Supp. 3d 346, 358 (D.S.C. 2018). However, based on the totality of the evidence presented, the court finds Respondent

has failed to demonstrate that CFS has become well-settled in his new environment by a preponderance of the evidence.

## IV.    Conclusion

For the foregoing reasons, the court will **grant** the petition for the return of CFS to South Korea.  An appropriate Order shall accompany this Memorandum Opinion.

**ENTERED** this 6th day of December, 2024.


/s/ *Jasmine H. Yoon*
_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE